UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT COVINGTON
CIVIL ACTION NO.: 2:08-cv-00224-WOB

| | | |
|---|---|---|
| CERTAIN UNDERWRITERS<br>  AT LLOYD'S | ) | ***Electronically Filed*** |
| | ) | |
| | ) | **MEMORANDUM OF LAW IN** |
| **PLAINTIFF** | ) | **RESPONSE TO MOTION FOR** |
| | ) | **SUMMARY JUDGMENT BY** |
| VS. | ) | **PLAINTIFF, AND IN SUPPORT** |
| | ) | **OF JOINT CROSS-MOTION** |
| | ) | **FOR SUMMARY JUDGMENT** |
| EARLYWINE RACING, INC., | ) | **BY DEFENDANTS,** |
| | | **EARLYWINE** |
| FRANCES NICOLE EARLYWINE a/k/a | ) | **RACING, INC., FRANCES** |
| NIKKI EARLYWINE and THADDEUS | ) | **NICOLE EARLYWINE AND** |
| AUSTIN PETERSON | ) | **THADDEUS AUSTIN** |
| | ) | **PETERSON** |
| **DEFENDANTS** | ) | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) | |

This matter is before the Court on Cross-Motions for Summary Judgment by the

Plaintiff, Certain Underwriters at Lloyd's (hereinafter "Underwriters") and the

Defendants, Earlywine Racing, Inc. and Frances Nicole Earlywine (hereinafter jointly

referred to as "Earlywine") and  Thaddeus Austin Peterson (hereinafter "Peterson").

This Memorandum is submitted in opposition to Underwriters'  Motion for Summary

Judgment and in support of the Joint Cross-Motion for Summary Judgment filed by

Earlywine and Peterson.

**STATEMENT OF THE CASE**

This case was filed on December 4, 2008, by Underwriters seeking a Declaratory

Judgment that a policy of liability insurance (hereinafter the "Policy")  issued by it to

1

Earlywine is void *ab initio* and permitting it to rescind the Policy. If successful,

Underwriters would then avoid its obligation under the Policy to provide Earlywine a

defense or indemnification for claims asserted by Peterson in an action filed by

Peterson against Earlywine on November 6, 2008, in the Mason Circuit Court of

Kentucky, Civil Action No.: 08-CI-00444.

Earlywine operates an indoor motorcross racing facility for motorized dirt bikes

and ATV's in Mason County, Kentucky. (Document 1, Complaint at ¶¶ 20-21).

Peterson's state court tort action was filed against Earlywine after Peterson was

seriously injured at Earlwine's race track on November 14, 2007, allegedly due to

Earlywine's negligence. Peterson was rendered paraplegic by those injuries.

In its original Complaint, Underwriters sought recission of the Policy on two

separate grounds:

- That in its initial and subsequent applications for liability insurance coverage, Earlywine failed to disclose a prior claim by an individual named Daniel Cahill who was paralyzed while using Earlywine's track;

- That Earlywine failed to disclose that all-terrain vehicles (ATVs) were permitted to race at its facility.

(Document 1, Complaint at Counts I and II, respectively). Underwriters further sought to

relieve itself of the defense and indemnity obligations under the Policy by claiming that

Earywine breached the terms of the Policy by using its own form of release for its

customers' execution rather than a form of release provided for that purpose by

Underwriters. (Document 1, Complaint at Count III).

However, discovery revealed that Earlywine provided substantial information to

Underwriters from which Underwriters could reasonably have been aware that ATVs

were permitted to utilize Earlywine's track. (Phillips Depo. at 63-64, 72-75, 82-88, 99-100, 109-113). Further evidence came to light indicating that Earlywine's form of release was not materially different than that offered for use by Underwriters and that the Earlywine release was tendered to Underwriters for review with no objection thereto having been asserted. (Phillips Depo. at 100-101). Thereafter, Underwriters amended its Complaint and abandoned its claims that the Policy should be rescinded for claimed non-disclosure of ATV use at the Earlywine track and that Earlywine breached the terms of the Policy by using its release rather than that offered by Underwriters. Thus, Underwriters' only remaining claim in support of its effort to avoid its defense and indemnity obligation to Earlywine is that the Policy should be rescinded because, allegedly, Earlywine failed to disclose the prior Cahill claim in its initial application for liability insurance, and in subsequent applications therefore.

## STATEMENT OF FACTS

Underwriters explains that it is composed of three London, England syndicates participating within the "Underwriters at Lloyds, London" umbrella which jointly underwrote the Policy. (Document 32-2, Memorandum at 2, n.1). Underwriters engaged the firm of Illinois RB Jones[1] (hereinafter "IRB Jones") as its managing general underwriter in the United States and granted IRB Jones binding authority to issue liability insurance policies on its behalf. (Document 32-4, Affidavit at ¶2). There is no dispute that as managing agent for Underwriters, knowledge possessed by IRB Jones

---

[1]IRB Jones was subsequently purchased by Burns & Wilcox, Ltd. and documents involved in the transactions between Underwriters and Earlywine refer to both entities at different time periods. (Document 32-4, Affidavit at ¶7). However, for purposes of these proceedings both will be referred to as "IRB Jones."

and/or its agents is imputed to Underwriters.  As general underwriter for Underwriters, IRB Jones presumably dealt with many  insurance brokers and agencies to "produce" insurance business.  One such "producer" enjoying an ongoing relationship with IRB Jones was Market Finders Insurance Corp. (hereinafter "Market Finders").  (Document 32-23, Producer Agreement).  The relationship between IRB Jones and Market Finders was memorialized by a Producer Agreement which, among other things, provided for the following:

- A commission arrangement between IRB Jones and Market Finders;

- A requirement that IRB Jones have access to "inspect and audit" all Market Finders' records related to any business written by IRB Jones;

- A requirement that Market Finders, "immediately upon receipt," report to IRB Jones any "claim or loss it has knowledge of" or "any fact, occurrence, or incident that may result in a loss or claim, under any policy of insurance placed through ILRBJ;"

- A specific admonition that Market Finders had no authority to investigate potential claims or "provide coverage opinions regarding any claim, loss or occurrence;"

- A requirement that Market Finders maintain errors and omissions coverage and that it indemnify IRB Jones for any loss occasioned by Market Finders' acts, errors, omissions, negligence or breach of the Producer Agreement.

(Document 32-23, Producer Agreement).  In addition to its Producer Agreement with IRB Jones, Market Finders held an appointment as an agent for Underwriters, as evidenced by a notification filed with the office of the Kentucky Department of Insurance.  (Certified records from Kentucky Department of Insurance, attached hereto as Exhibit "4").

4

Earlywine constructed and began operating its indoor motorized dirt bike and ATV race course in Mason County, Kentucky, in approximately September, 2004.[2] (Deposition of Frances "Nikki" Earlywine, hereinafter "Earlywine Depo.", at 12).[3] On October 16, 2004, shortly after the opening of the track, a close friend of the Earlywines, Daniel Cahill suffered serious injuries while operating a dirt bike on the Earlywine track. (Earlywine Depo. at 27-28). At the time of the Cahill accident, Earlywine did not have liability insurance coverage in force. (Earlywine Depo. at 17-18).

After talking with other track owners in 2005, the Earlywines learned that liability insurance for operations similar to theirs was obtained by at least one other owner through retail agent Gail Carter of The Putnam Agency in Ashland, Kentucky. (Earlywine Depo. at 18-19). The Earlywines initially contacted Carter by phone and subsequently met with her at their race track. (Deposition of Gail Carter, hereinafter "Carter Depo.", at 12-15). During that on-site visit, the Earlywines described their operation and advised Carter of the Cahill accident. (Earlywine Depo. at 23, 26-27). Subsequently, Carter prepared a liability insurance application for the Earlywines' signature, covering the period from July 7, 2005-July 7, 2006. The application indicated "none" in response to the question: "Enter all claims or losses regardless of fault and whether or not insured/or occurrences that may give rise to claims for the prior 5 years . . . ." Carter met with the Earlywines at their home and obtained the required

---

[2]Initially, the corporate entity operating the track was owned by Nikki Earlywine and her husband. Unfortunately, Nikki's husband died suddenly on June 29, 2007. (Earlywine Depo. at 80).

[3]The pages of the transcript of the deposition testimony of Frances "Nikki" Earlywine, the pages of the transcript of the deposition testimony of Gail Carter and the pages of the transcript of the deposition testimony of Tammy Jo Phillips referred to herein are attached hereto as Exhibits "1," "2" and "3," respectively.

signatures. (Earlywine Depo. at 26-27). Nikki Earlywine signed the application where Carter indicated their signature was required but she did not read the application. (Earlywine Depo. at 35).

During its dealings with Earlywine, The Putnam Agency had a contractual relationship with Market Finders[4] to refer business and upon receiving the Earlywines' executed insurance application the Putnam Agency referred the application to Market Finders who then submitted the application to IRB Jones. IRB Jones, pursuant to its binding authority with a company called "Alea, London," then issued a liability insurance policy to Earlywine. Significantly, even though adequate information about the nature of Earlywine's operation was submitted to IRB Jones, IRB Jones incorrectly evaluated and underwrote the Earlywine risk as a BMX, non-motorized bicycle track, rather than a facility providing for motor bike and ATV racing.[5]

On October 15, 2005, Cahill filed suit in the Mason Circuit Court seeking damages for the injuries he suffered in the October 16, 2004, accident. Earlywine was served with summons and the Complaint and immediately forwarded both to its private counsel. (Earlywine Depo. at 46-47). Earlywine's attorney forwarded the Cahill suit to Gail Carter and requested defense and indemnity. (Carter Depo. at 23-25; a copy of counsel's notification and a copy of the Cahill Complaint has been filed as Document 32-9). Carter then forwarded the Cahill suit to Market Finders. (Carter Depo. at 125).

---

[4]The contractual arrangement between Market Finders and The Putnam Agency was primarily to confirm that The Putnam Agency had errors and omissions insurance coverage in place. (Phillips Depo. at 32-33).

[5]The significance of this underwriting error by IRB Jones will be discussed later as it relates to whether IRB Jones' own negligence precludes it from now engaging in what amounts to a post-claim underwriting of the Earlywine risk.

Market Finders received the copy of the Cahill lawsuit and it was referred to an internal Market Finders' claims person. (Phillips Depo. at 102-106). While Market Finders could not confirm that it then forwarded a copy of the Cahill lawsuit to IRB Jones, its normal practice, consistent with its obligations under the Provider Agreement with IRB Jones, was to forward all documents such as the Cahill summons and Complaint to IRB Jones. (Phillips Depo. at 72-73, 75, 80-82, 99-100, 109, 111, 113). In any event, Market Finders ultimately advised Gail Carter that the Cahill claim preceded the effective date of the liability insurance policy written through IRB Jones, and thus no coverage for the loss was afforded. (Carter Depo. at 25).

The liability insurance coverage obtained by Earlywine through The Putnam Agency, Market Finders and IRB Jones was not automatically renewable. Thus, Earlywine submitted additional applications which were passed along to IRB Jones, through The Putnam Agency and Market Finders, for successive policy periods from July 7, 2006-July 7, 2007, and from July 7, 2007-July 7, 2008. The subsequent applications were nearly identical to Earlywine's initial application in that they were each prepared on pre-printed forms by Gail Carter from information she already had in her files. (Carter Depo. at 69-75). On each occasion Carter placed an "x" indicating no prior claims (even though she had the Cahill lawsuit in her files) and submitted the applications to Earlywine for signature. (Carter Depo. at 40, 51). The pre-prepared applications were signed by Earlywine on each occasion without actually reading the applications. (Carter Depo. at 30-31; Earlywine Depo. at 45-46, 51-52). The Cahill claim was not specifically noted on either of the subsequent applications. (Carter Depo. at 76-79). While the first liability insurance policy was written by IRB Jones through

"Alea, London," the two subsequent policies, including the Policy at issue here, were written by IRB Jones through Underwriters.

Peterson was rendered paraplegic as a result of injuries he suffered during an accident at the Earlywine facility on November 14, 2007, and filed suit against Earlywine on November 8, 2008. The Peterson lawsuit prompted this action by Underwriters seeking a declaration that the policy issued to Earlywine should be rescinded and declared void *ab initio*.

## ARGUMENT

### A.      Standard on Motion for Summary Judgment.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c); *Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc.*, 862 F.2d 597, 601 (6th Cir. 1988).  The party moving for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).   If the moving party discharges his burden, the burden then passes to the non-moving party to establish, after an adequate opportunity for discovery, the existence of a disputed factual element essential to non-movant's case with respect to which the moving party bears the burden of proof.  *Id.* at 325.  The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a

genuine issue for trial.'" *Id.* at 324. If the record taken as a whole could not lead the trier of fact to find for the non-moving party, the moving party's motion for summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed. 538 (1986).

In engaging in the foregoing analysis, this Court, sitting in diversity, must apply Kentucky law. *Erie Ry. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). If the law is not otherwise clear, the Court must predict how Kentucky's highest court would rule. *Dinsmore Instrument Co. v. Bombardier, Inc.*, 199 F.3d 318, 320 (6th Cir. 1999).

**B.      There is No Genuine Issue of Material Fact and Earlywine and Peterson are Entitled to Judgment as a Matter of Law.**

**1.      Market Finders and The Putnam Agency Were the Agents of IRB Jones and Underwriters and Underwriters is Thus Estopped from Seeking Rescission of the Earlywine Policy Based on its Agents' Actions or Inactions.**

It is undisputed that the Cahill claim was disclosed by Earlywine to The Putnam Agency and by The Putnam Agency to Market Finders in October, 2005. While Market Finders was required to disclose the Cahill claim to IRB Jones under its Producer Agreement, and Market Finders' custom and practice was to do so, Underwriters claims that IRB Jones was never advised of the Cahill claim. However, even if Market Finders failed to disclose the Cahill claim to IRB Jones and Underwriters, Market Finders' knowledge of the Cahill claim is imputed to IRB Jones and Underwriters as a matter of law and Underwriters is thus estopped from seeking rescission of the liability insurance policy written to Earlywine based on its claimed lack of such knowledge.

9

In its Memorandum in support of its Motion for Summary Judgment, Underwriters urges strongly that The Putnam Agency and Market Finders were not its agents, but agents of Earlywine. Thus, according to Underwriters, if either The Putnam Agency, Market Finders or both possessed claim information but failed to pass that information to IRB Jones, Earlywine must suffer the consequences of its agents' negligence. However, this argument ignores Kentucky statutory provisions, longstanding Kentucky precedent and Underwriters' specific appointment of Market Finders as its agent in Kentucky.

Under Kentucky law, an insurer such as Underwriters is bound by the acts of its agents. KRS 304.9-030. Kentucky law on this very subject was recently summarized by Hon. Thomas B. Russell, Chief Judge of the United States District Court for the Western District of Kentucky, in *Century Surety Co. v. Ken Bar, LLC*, 2009 WL 2602809 (W.D.Ky. Aug. 24, 2009). There, Ken Bar obtained a liability insurance policy through its local agent, AIA Insurance Co., from Century Surety Co. Coincidentally, AIA brokered the Century Surety policy through Market Finders. After Ken Bar was sued on a claim that Ken Bar's negligence contributed to a sexual assault and murder occurring on the insured premises, Century Surety filed an action seeking a declaration that it had no obligation to defend or indemnify Ken Bar. Ken Bar counterclaimed, asserting that Century Surety was estopped from denying coverage because AIA had assured Ken Bar that claims such as those involved were covered under the Century Surety policy. Century Surety argued that it could not be bound by AIA's actions because AIA was the agent for Ken Bar, not Century Surety. In evaluating Century Surety's Motion for Summary Judgment, Judge Russell explained:

"Kentucky statutory and case law have historically provided that anyone who solicited and received applications for insurance on behalf of an insurance company was an agent of the company 'anything in the policy or application to the contrary notwithstanding.'" *Pan-American Life Ins. Co. v. Roethke*, 30 S.W.3d 128, 131 (Ky. 2000). Kentucky law also recognizes "the need to protect consumers from insurers who, in drafting contracts of adhesion, attempt to exculpate themselves from liability for the mistakes of those who market their product." *Id.*

> Few persons understand insurance who have not made it a
> special study. The agent who comes to get the insurance is
> the only person they deal with or know in the transaction.
> The rule that he represents the company and not the insured
> in taking the application is just and is generally recognized.

*Motorists Mut. Ins. Co. v. Richmond*, 676 S.W.2d 478, 481 (Ky.Ct.App. 1984).

Based on the current record, the Court cannot find that AIA was not [Century Surety's] agent as a matter of law. Under Kentucky law, an "agent" is "any individual or business entity appointed by an insurer to sell or to solicit applications for insurance . . . on its behalf." KRS 304.9-020. In this case, it is possible that AIA sold insurance to [Ken Bar] on behalf of [Century Surety], which would fall within the statutory definition of "agent." The mere fact that [the AIA employee] testified that he considered himself [Ken Bar's] agent is by itself insufficient to alter this analysis, as Kentucky courts will ignore such an agreement if the statutory definition of "agent" is satisfied. *Pan-American Life Ins. Co.*, 30 S.W.3d at 131 (insurer cannot avoid agency relationship through contractual arrangement). The fact that [Century Surety] had an additional intermediary (Market Finders) between itself and AIA also does nothing to prevent AIA from being [Century Surety's] agent, so long as AIA sold or solicited insurance on [Century Surety's] behalf.

While [Century Surety] argues that AIA was never "appointed" to sell policies on its behalf and was never vested with the implied or apparent authority necessary to bind it, [Century Surety] does not discuss what precisely is the business arrangement between [Century Surety's] admitted agent, Market Finders, and AIA. Based on the Court's understanding of Kentucky case law, Kentucky courts would be unlikely to accept an insurance company's use of intermediaries if such an arrangement is an "attempt to exculpate themselves from liability for the mistakes of those who market their product." *Pan-American Life Ins. Co.*, 30 S.W.3d at 131. However, without knowing the agreements between [Century Surety], Market Finders, and AIA, the Court cannot make such a determination.

11

*Century Surety Co. v. Ken Bar, LLC*, 2009 WL 2602809 at *6.[6]

Here, Market Finders held a specific agency appointment from Underwriters and had a written contract to "produce" insurance applications for IRB Jones/Underwriters. Market Finders had a long relationship with IRB Jones whereby it would solicit insurance applications from agencies such as The Putnam Agency and submit them to IRB Jones so that policies could then be written. Under Kentucky law, IRB Jones/Underwriters cannot separate themselves from Market Finders and The Putnam Agency.

Kentucky's recognition of agency in the context of "soliciting agents" and insurance companies and the policy considerations described by Judge Russell have been established for well over 100 years. In *Mutual Ben. Health & Accident Ass'n v. Smith*, 257 Ky. 288, 77 S.W.2d 957 (1935), Kentucky's then highest court cited many prior cases, some from the 19th century, for the rule that knowledge of a soliciting agent is imputed to the insurance company who later writes insurance coverage. There, a Paducah dentist sought benefits under a disability policy. The disability insurance company had a designated local agent who had placed application blanks in the hands of several men who were then to solicit insurance business for him for a division of the commission earned from the disability insurance company. The men soliciting the

_____

[6]While Chief Judge Russell did not have sufficient evidence defining the relationship between Century Surety, Market Finders and AIA to determine whether AIA was the "agent" for Centurty Surety, he granted Century Surety's Motion for Summary Judgment on the grounds that Ken Bar had not produced any evidence to support its claim that the AIA agent misrepresented the terms of the Century Surety policy at the time of procurement and the Century Surety policy clearly excluded from coverage the type of claims which had been asserted against Ken Bar in the underlying state court action. A motion by Century Surety to clarify Chief Judge Russell's opinion on a point unrelated to his analysis of Kentucky law imposing certain agency relationships between insurers and insurance producers is currently pending. Chief Judge Russell's opinion is cited nonetheless because of its precedential value in relation to a material issue in this case.

business were referred to as "brokers" and their acts were admittedly unknown to the disability insurance company.

When the dentist became disabled and applied for benefits under his policy, the disability insurance company denied the claim and asserted in defense that the dentist had made material misrepresentations in his application taken by the insurance "broker."  The dentist countered that despite the contents of his application, he had provided complete information to the "broker" and the "broker's" knowledge was imputed to the disability insurance company.  The disability insurance company argued that the "broker" was not its agent, but the dentist's agent and therefore the "broker's" knowledge was not imputed to it.

Framing the issue with respect to one of the claimed misrepresentations[7] as whether the "broker" or "soliciting agent" was to be regarded as the agent of the disability insurance company, the Court noted that, "The established rule in this jurisdiction is that knowledge of a soliciting agent taking an application for insurance and his acts of waiver are attributable to the company he is representing."  *Id*., 77 S.W.2d at 958.  While noting that all jurisdictions were not in accord, Kentucky's then highest court clearly adopted the position that upon accepting an application from a "broker" or "soliciting agent," then writing a policy thereupon and collecting premiums, the insurance company is bound by the acts and statements of the "broker" or "soliciting agent."  Thus, Kentucky clearly aligned itself with those jurisdictions which hold, "that

---

[7]While the Court held that the "broker's" or "soliciting agent's" knowledge and conduct was imputed to the disability insurance company, thus acting as an estoppel as to that knowledge or conduct, the Court ultimately upheld the disability insurance company's denial of benefits based on other misrepresentations by the dentist which were not within the scope of knowledge of the "broker" or "soliciting agent."

the knowledge of an agent soliciting insurance who turns over the application to a company which he does not represent, which issues and delivers a policy to him, waives a breach, as by accepting the application it recognizes him as its agent." *Id*. 77 S.W.2d at 958-959.

While the language of relevant statutory provisions have been modified slightly over the years, the underlying principals articulated in *Mutual Ben. Health & Accident Ass'n v. Smith*, 257 Ky. 288, 77 S.W.2d 957 (1935), remain valid. Judge Russell's citation to the Kentucky Supreme Court's opinion in *Pan-American Life Ins. Co. v. Roethke*, 30 S.W.3d 128, 131 (Ky. 2000), stands as clear confirmation. There, an insurance broker sold a group health insurance policy written by Pan-American Life to a Louisville business. It was undisputed that the application for the group policy clearly stated that the broker was not Pan-American's agent. During the application process the broker represented to the employer that the group health policy would cover work related injuries suffered by employees. Actually, the group health insurance policy written by Pan-American excluded work-related injuries and illnesses.

An employee suffered a serious work-related injury and filed a claim under the Pan-American policy. Pan-American denied the claim, citing the exclusion for work-related injuries. The employer countered that Pan-American was estopped from denying coverage based on the representations of the insurance broker, to which Pan-American argued it was not bound because the broker was not its agent.

Judge Russell quoted extensively from the Kentucky Supreme Court's opinion holding that regardless of the language contained in the contract between Pan-American and the broker, Kentucky statutory and common law principals controlled and

compelled a finding that the broker was Pan-American's appointed agent,[8] Pan-American was thus bound by the statements of the broker to the employer during the application process, and Pan-American was estopped from denying coverage for the work-related injury suffered by the employee.

In its Motion for Summary Judgment, Underwriters simply asks the Court to assume that neither The Putnam Agency nor Market Finders were its agents, flatly ignoring the import of Kentucky statutes and significant Kentucky jurisprudence imposing an agency relationship in facts substantially the same as existed between IRB Jones/Underwriters and Market Finders. Underwriters places no significance upon Market Finders' admitted knowledge of the Cahill claim. Rather, Underwriters repeatedly refers to the insurance applications. Underwriters then cites *Pennsylvania Life Ins. Co. v. McReynolds*, 440 S.W.2d 275 (Ky. 1969), for the proposition that an insurance applicant is responsible for the content of his application when either he or his agent inserts incorrect information in the application. However, *McReynolds* has no application in the circumstances presented in this case because despite the content of the Earlywine insurance application, actual knowledge of the Cahill lawsuit was provided to Market Finders and Market Finders is the agent of IRB Jones/Underwriters.

Based on the foregoing, it is clear that the following undisputed facts act as an estoppel against Underwriters' efforts to rescind the Earlywine Policy and avoid its duty to defend and indemnify Earlywine:

---

[8]The Kentucky Supreme Court noted that while Pan-American was estopped from denying coverage to the injured employee, it was not likely without recourse, explaining that "there is nothing in the record that would prevent [Pan-American] from seeking indemnity from its agent." *Pan-American Life Ins. Co. v. Roethke*, 30 S.W.3d at 133. Similarly, while Underwriters clearly is bound by the knowledge of Market Finders, there is nothing to prevent Underwriters from seeking indemnity from Market Finders for failing to disclose the information about the Cahill claim which Market Finders possessed.

- Earlywine notified The Putnam Agency of the Cahill lawsuit before its application for the Policy in issue;

- The Putnam Agency notified Market Finders of the Cahill lawsuit before Earlywine's application for the Policy in issue;

- IRB Jones was the agent of Underwriters with responsibility to provide underwriting functions and with authority to write and bind insurance coverage for Underwriters;

- Market Finders held a specific agency appointment from Underwriters which was filed with the Kentucky Department of Insurance pursuant to KRS 304.9-020(1), (2);

- IRB Jones had an ongoing, contractual relationship with Market Finders for Market Finders to produce applications for insurance in return for a share of the commission charged;

- IRB Jones accepted the application for insurance produced by Market Finders, accepted premiums therefore and presumably shared those premiums with Market Finders.

As the Kentucky Supreme Court explained in *Pan-American Life Ins. Co. v. Roethke*, 30 S.W.3d at 133, "[Pan-American] assumed the risk that its appointed agent might misrepresent the coverage it offered . . . ." Likewise, IRB Jones/Underwriters assumed the risk that by appointing Market Finders to produce insurance applications for it, Market Finders may negligently fail to disclose all information in its possession relevant to a proposed risk. Presumably, it is for precisely this reason that the Producer Agreement between IRB Jones and Market Finders requires Market Finders to maintain errors and omissions insurance and to indemnify IRB Jones for losses resulting from Market Finders' negligence.

Clearly Underwriters is bound by Market Finders' knowledge of the Cahill lawsuit which pre-dated Earlywine's insurance applications for policy periods 2006-2007 and 2007-2008, regardless of non-disclosure of the claim in the applications. Where the

16

insurer is fully cognizant of the facts, false answers to even material questions will not void an insurance policy. *Lincoln Income Life Ins. Co. v. Burchfield*, 394 S.W.2d 468 (Ky. 1965).

**2.  Earlywine at all Times Acted in Good Faith and Made no "Misrepresentation" Which Could Entitle Underwriters to Rescind the Policy.**

Underwriters contends that it is entitled to rescind Earlywine's Policy because of a "material misrepresentation" in response to an application question. Significantly, Underwriters does not contend that Earlywine acted in bad faith or with any improper motive in supplying the incorrect answer to the question in the application. In fact, it is undisputed that Earlywine's lawyer notified The Putnam Agency of the Cahill claim shortly after the Cahill lawsuit was filed and that The Putnam Agency notified Market Finders upon its receipt of information about the claim.

While Underwriters is quick to characterize Earlywine's conduct as a "misrepresentation" which was material under Kentucky law, it focuses primarily on whether the alleged "misrepresentation was "material" and spends no effort explaining how Earlywine's un-intentional failure to list the Cahill claim on its application squares with Kentucky's definition of "misrepresentation" in the insurance context. Under Kentucky insurance law, "misrepresentation" is defined as follows:

> A misrepresentation in the law of insurance is a statement as a fact of something which is untrue, which the insured states with the knowledge that it is untrue and with intent to deceive, or which he states positively as true without knowing it to be true, and which has a tendency to mislead . . . .

*Aetna Ins. Co. v. Solomon*, 511 S.W.2d 205 (Ky. 1974). In other words, in order to permit the harsh action of rescinding a policy, post-claim, Underwriters is required to

show not only that Earlywine's statement was false but additionally that in making the statement it intended to deceive Underwriters. The standard in Kentucky requires some affirmative evidence that the applicant's false statement was made with "intent to deceive" the insurer rather than the result of an honest mistake, oversite or mis-interpretation of the question posed in the application. Here, Underwriters is unable to prove deceptive intent and the Defendants are entitled to Judgement as a matter of law upholding the validity of the Policy.

**3.  Any Failure by Earlywine to Disclose the Cahill Claim Cannot be Considered "Material" In Light of IRB Jones'/Underwriter's Negligence in Evaluating the Earlywine Risk as a BMX Bicycle Track.**

Although IRB Jones was provided detailed and comprehensive information describing Earywine's operation of a motocross racing facility, IRB Jones inexplicably acted under the mis-impression that a BMX, or non-motorized bicycle track was being insured.  (Document 28, First Amended Complaint at Count II; Amalfi Claims summary, Bates No.: CUL.SAG 0409, attached hereto as Exhibit "5").  IRB Jones' negligence in mis-underwriting the Earlywine risk is significant because underwriting guidelines used by IRB Jones to evaluate the Earlywine Risk specifically described "Ineligible Business" as including "ATV's and any motorized 2 wheel exposure."  (IRB Jones Underwriting Guidelines, attached hereto as Exhibit "6").

IRB Jones had no standards to underwrite the very type of risk posed by Earlywine's application for liability insurance because it was prohibited by Underwriters from even considering Earlywine's operation.  Thus, IRB Jones had absolutely no standards or guidelines by which it could reasonably evaluate whether the

misrepresentation it claims Earlywine made was material.  Presumably for that reason Underwriters points to no underwriting standards to support its claim that Earlywine's failure to discloses the Cahill claim was "material."  Instead, it implores this Court to take judicial notice that the failure to disclose the Cahill claim in Earlywine's applications were "self-evidently material to the risk being submitted."  (Document 32-2, Memorandum at 3).

Without some standard by which Underwriters' claim of materiality can be measured, its claim that but for Earlywine's false statement it would not have written the Policy is simply arbitrary.  Even if we assume that a completely accurate insurance application would have caused IRB Jones to decline to insure Earlywine as a bicycle track, there is no way of knowing what the underwriting guidelines for a motocross facility would have been.

It is not sufficient for IRB Jones to implicitly acknowledge that it was negligent in writing insurance for Earlywine through Underwriters in the first place, fail to articulate any standards applicable to the actual Earlywine risk,  and urge the Court to blindly accept its contention that it would have declined Earlywine's application.  Post-claim recission of a liability insurance policy is an extraordinary remedy.  It places the insurance consumer in an extremely precarious position.  An insurance consumer like Earlywine pays a premium then, after it is too late to obtain substitute insurance, the insurer contends that, as in this case, despite its own negligence in not properly evaluating the risk and declining coverage in the first instance and without any standards by which to measure its conduct, the insurance consumer's blanket of protection should be jerked from under it.  Without appropriate standards, IRB

Jones/Underwriters cannot establish that the alleged false statement contained in Earlywine's insurance applications was material at all. Thus, its Motion for Summary Judgment must be rejected and the Defendants' Cross-Motion for Summary Judgment granted.

**C.      Alternatively, Genuine Issues of Material Fact Exist as to Whether Market Finders was IRB Jones'/Underwriters' Agent and Whether the False Statements Attributed to Earlywine Were "Material," Precluding Entry of Summary Judgment in Favor of Underwriters.**

While the Defendants contend strongly that they, rather than Underwriters, are entitled to Judgment as a matter of law, alternatively there are genuine issues of material fact on the issues of the agency relationship between Underwriters, IRB Jones and Market Finders, whether a "misrepresentation" can be attributed to Earlywine at all, and whether the false statements attributed to Earlywine were "material," thus precluding summary judgment.

**CONCLUSION**

Based on all of the foregoing, this Court is respectfully requested to grant the Defendants' Joint Motion for Summary Judgment, declare that Underwriters is estopped from recission of the Policy and further declare that Underwriters has a duty to defend and indemnify Earlywine with respect to Peterson's claim.

Respectfully submitted,

**JOSEPH H. MATTINGLY III**
**MATTINGLY &  NALLY-MARTIN, PLLC**
Attorneys at Law
104 West Main Street, Box 678
Lebanon, Kentucky 40033
(270) 692-1718


By     /s/ *Joseph H. Mattingly III*
      JOSEPH H. MATTINGLY III
*Counsel for Defendant, Thaddeus Austin*
*Peterson*

**MARK T. HAYDEN**
**V. BRANDON MCGRATH**
**GREENEBAUM DOLL & McDONALD PLLC**
2900 Chemed Center
255 East Fifth Street
Cincinnati, Ohio 45202

By:     /s/ *Mark T. Hayden* [with permission]
      MARK T. HAYDEN
*Counsel for Defendants, Earlywine Racing, Inc.*
*and Frances Nicole Earlywine a/k/a Nikki*
*Earlywine*